UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 3:26-CR-22 |
| | : | |
| v. | : | (Judge Munley) |
| | : | |
| ANDREW MULKERIN, | : | |
| Defendant. | : | |

**GOVERNMENT'S BRIEF IN SUPPORT OF ITS *MOTION IN LIMINE* AND NOTICE OF INTENT TO INTRODUCE RELEVANT EVIDENCE OR, ALTERNATIVELY TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 404(B)**

The United States, by and through undersigned counsel, has filed a motion before this Court for an Order allowing for the use of intrinsic evidence related to the defendant's January 7, 2026, threat to murder and assault unnamed United States judges and unnamed Federal law enforcement officers, to wit, by telling a Deputy United States Marshal that he would "shoot up" the Sylvia H. Rambo United States Courthouse.

## I.   BACKGROUND

On February 18, 2026, a federal grand jury in Harrisburg, Pennsylvania, returned an Indictment charging the defendant, Andrew Mulkerin, with one count of Threatening to Assault United States

Judges and Federal Officers, in violation of Title 18, United States Code, Section 155(a)(1)(B). (Doc. 1).

Trial in this matter is presently scheduled for April 13, 2026. (Doc. 29).

## II.   DISCUSSION

A.   Evidence of DUSM Hartman's investigation into the Defendant's Past Concerning Behavior and DUSM Hartman's Knowledge regarding the Defendant's Access to Firearms is Intrinsic to the Charged Offense Conduct

i.    Rule 404(b) Analysis

**Rule 404(b) provides:**

**(b) Other Crimes, Wrongs, or Acts.**

**(1) Prohibited Uses.** Evidence of another crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

**(2) Permitted Uses.**  This evidence may be admissible for another purpose, such as proving ***motive***, opportunity, ***intent***, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. (emphasis added).

However, FRE 404(b) only applies to evidence of wrongful acts that are "extrinsic" to the charged offense.  Evidence that is "intrinsic"

2

does not fall within the rule. *United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010). "Intrinsic" evidence is reserved for two categories of evidence: (i) if the evidence directly proves the charged offense; and (ii) "uncharged acts performed contemporaneously with the charged crime if they facilitate the commission of the charged crime." *Id.* at 248-249.

The Third Circuit in *Green* went on to explain that most, if not all evidence that relates to the background of the case, that shows the relationships of the players, or that "completes the story" is admissible as intrinsic evidence. *Id* at 249.

In addition, evidence is intrinsic when exclusion would leave a "chronological or conceptual void in the story of the crime…" *United States v. Ojomo*, 332 F.3d 489, 488-89 (7th Cir. 2003).

Thus, where proof of an act directly proves a material allegation of the indictment, as it does here, the evidence will likely be viewed as intrinsic. *See also United States v. Hoffecker*, 530 F.3d 137, 189-90 (3d Cir. 2008) (evidence that a defendant charged with commodities fraud had been given a lifetime ban on trading in precious metals, and

therefore situated his venture outside the U.S., was intrinsic to the fraud and thus not subject to Rule 404(b)).

In order to prove the sole charged offense in this case, the Government must establish that defendant had the *intent* to threaten to assault and murder United States judges or law enforcement officers, and that the threat was also made by the defendant with the *intent* to *interfere* with the judges/officers' official duties or with the *intent to retaliate* against such judges and officers on account of the performance of their official duties.[1]

Here, the Government intends to introduce several such "intrinsic" acts committed by the defendant which prove the defendant

---

[1] Title 18, U.S.C. §155(a)(1)(B), states, in relevant part, the following:

Whoever –

(B) **threatens** to assault, kidnap, or murder, a United Stated official, a United States Judge, a Federal Law enforcement officer, or an official whose killing would be a crime under such section…

with the **intent to impede,** intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with **intent to retaliate** against such official, judge, or law enforcement office on account of the performance of official duties, shall be punished as provided in subsection (b). (emphasis added).

had the requisite intent. That evidence, described in detail in the Government's Motion in Limine and Notice, includes, but is not limited to, the actions undertaken by the defendant from December 2023, through January 7, 2026, which were known to DUSM Hartman as part of his investigations into the defendant's concerning behavior toward courthouse staff, attorneys, and other law enforcement personnel, as well as DUSM's knowledge that the defendant had access to multiple firearms as of January 7, 2026.

These actions are intrinsic to the present threats case as they directly prove the defendant's *intent* to *threaten* and that the purpose of the threat was to *interfere* with United States judges and law enforcement personnel's official duties, or to *retaliate* against those judges and law enforcement personnel. The actions are further being offered for proper, non-propensity such as the defendant's motive, his knowledge of how the threat would be received by hearer, to establish the relationship between the defendant and DUSM Hartman, and to "complete the story" of the case. *See Hoffecker,* 530 F.3d at 189-90; *see also United States v. Williams,* 647 Fed. Appx. 144, 148-49 (3d Cir. 2016)(evidence highlighting defendant's abusive behavior towards

5

girlfriend was intrinsic to proving his attempt to corruptly persuade a witness).

Beyond directly proving the defendant's intent to impede with the official duties of United States judges and Federal Law enforcement officers and/or retaliate against said judges/officers, the evidence also directly establishes another essential element of the charged offense, that the defendant's threat to DUSM Hartman was a "true threat," and not constitutionally protected speech.

In *Counterman v. Colorado*, the Supreme Court recently held that the First Amendment requires the government to prove in a criminal prosecution for "true threats" that the defendant subjectively understood the threatening nature of his statement but that a mental state of recklessness is constitutionally sufficient. 600 U.S. 66 (2023). The Court further re-affirmed that "true threats are serious expressions conveying that a speaker means to commit an act of unlawful violence." *Id.* at 74. Although *Counterman* addressed a state statute, its constitutional holding applies to federal threat offenses, such as 18 U.S.C. §115(a). *See, e.g., United States v. Turner*, 720 F.3d 411 (2d. Cir. 2013).

The past behavior of the defendant, investigated by DUSM Hartman, would directly prove that the defendant's January 7, 2026, statement to DUSM to "shoot up" the courthouse was meant to be a serious expression of unlawful violence and not protected speech, in that it establishes the context of the threat, the defendant's willful choice to express that threat directly to the federal officer the defendant knew had been investigating him for past threatening behavior, and would establish the defendant's knowledge that DUSM Hartman would likely react and receive the threat as a serious expression of violence, which the defendant was willing and capable of carrying out.

Therefore, the charged offense is "inextricably intertwined" with Supervisory Deputy United States Marshal Matthew Hartman's long-standing investigation into the defendant's prior concerning conduct and is intrinsic to the instant case. *See Green*, 617 F.3d at 245.

### ii.    True Threat Analysis

In evaluating whether a statement constitutes a true threat unprotected by the First Amendment, and therefore an essential part of the instant case, courts frequently evaluate, among other factors, (1) the specific language of the threat; (2) the listeners' reaction to the

7

statement; (3) whether the threat was communicated directly to the victim; (4) whether the threat was conditional; and (5) the context in which the threat was made.

1) Specific Language of the Threat

The first inquiry concerns the specific language of the threat. Even "outlandish," "illogical," and "ridiculous" statements can be considered true threats because "potential assassins may well be irrational." *United States v. Kosma*, 951 F.2d 549, 553 n.6 (3d Cir. 1991). And vague or facially ambiguous statements, too, can be threats, so long as contextual factors including listener reaction suggest the existence of a true threat. For example, in *United States v. Stoner*, 781 F. App'x 81, 83 (3d Cir. 2019), the defendant—a frequent township meeting attendee who was dissatisfied with his local government (Conewago Township in Pennsylvania)—appeared at a township meeting wearing a machete-type knife and holster strapped to his leg. He stated to one city official that if another city official "continues to act in the way she is, I think Houston, Texas, is going to turn into Conewago Township," adding that he was referring to "where they shot all them cops." *Id.* at 83-84. The government presented evidence that

the defendant intended to state that Conewago Township would turn into *Dallas, Texas*, where several police officers had recently been killed. *Id.* at 84 n.1. The defendant and his girlfriend posted a recording of this encounter on YouTube. *Id.* The defendant was thereafter charged with and convicted for, *inter alia*, violating 18 U.S.C. § 875(c) for the post. In upholding his conviction, the Third Circuit emphasized—notwithstanding the ambiguity of the defendant's language—that his reference to a "highly sensitive subject matter" such as a "mass shooting of police officers" suggested a "desire to convey a threat to commit similar violence."

Similarly, in *Torres v. Clark*, 522 F. App'x 103, 104 (3d Cir. 2013), a vague statement concerning violence toward a government official was held to be a true threat. In *Torres*, the defendant—a state prisoner—was frustrated with a prison guard who had issued him a misconduct report. He subsequently wrote a letter to a third party that concluded with the statement: "if [the guard] keeps acting like he is above policy/law somebody is going to break his jaw is what I assume?!" *Id.* (alterations omitted). This letter was intercepted, the defendant was administratively disciplined, and he filed a civil rights lawsuit alleging,

9

*inter alia*, that he had been retaliated against for protected speech (complaining about the prison guard). *Id.* at 105. The Third Circuit, however, upheld a determination by the district court that the statement was "not constitutionally protected because it is a 'true threat.'" *Id.*; *see also United States v. Stock*, 728 F.3d 287, 301 (3d Cir. 2013) (holding that even a "wish could [] constitute a threat in the right context").

Here, the language of the defendant's threat could not be more direct. While travelling in an elevator together in the Sylvia H. Rambo United States Courthouse, immediately after a bankruptcy case involving the defendant was dismissed, the defendant told DUSM Hartman, a man the defendant knew had been investigating him for threatening behavior in court for nearly two years, that he was going to "shoot up" the place, meaning the courthouse.

The evidence of the prior investigation, including DUSM Hartman's repeated interviews with the defendant, shows that on January 7, 2026, defendant knowingly choose *direct* language to communicate his serious threat of impending violence. Such evidence would show that the defendant was aware that in his past, potentially

innocuous behavior or language, such as signing off emails with vaguely threatening references, had been perceived by others as threatening behavior.

Instead, on the date of the offense, the defendant choose *direct* language for his threat, language which the defendant knew would not be interpreted in any other way but as a serious expression of impending and unlawful violence.

2) Listener Reaction

How listeners respond and react to a threat also informs the true threat analysis. *See Watts v. United States*, 394 U.S. 705, 707 (1969); *Kosma*, 951 F.2d at 554 (same). Where the listeners' reaction is laughter or where the listeners otherwise fail to take the statement seriously, it is less likely to be a true threat. For example, in *Watts*, the defendant stated at an anti-Vietnam rally in front of the Washington Monument that if "they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706. In holding that this was not a true threat, the Court emphasized the crowd's laughter after the statement. *See id.* at 707; *see also United States v. Richards*, 271 F. App'x 174, 175 (3d Cir. 2008) (overturning threat conviction on

11

willfulness grounds where defendant ranted in a homeless shelter that he was going to, among other things, "put two bullets into Senator Clinton" but where those who overheard the statements did not view them as threats).

By contrast, statements are more likely to be considered threatening when listeners take actions suggesting that they view the statement as a threat. This is true when victims contact law enforcement. *See Elonis*, 841 F.3d at 592 (victim contacted local police and FBI); *United States v. Jackson*, 364 F. App'x 776, 780 (3d Cir. 2010) (victim "was alarmed enough to call his wife and the police"); *United States v. D'Amario*, 330 F. App'x 409, 413 (3d Cir. 2009) (public official victim contacted U.S. marshals to conduct a threat assessment); *United States v. Voneida*, 337 F. App'x 246, 248 (3d Cir. 2009) (viewers of threatening social media post "called the police"). Or when they take security precautions after hearing or viewing the statement. *See Elonis*, 841 F.3d at 592 (police "took steps to enhance park security"); *D'Amario*, 330 F. App'x at 413 (victim "had a security system installed in his home").

12

Here, the evidence from DUSM Hartman's prior investigations, would explain DUSM Hartman's immediate understanding that the defendant's words were a true threat.  DUSM Hartman had spoken with the defendant several times about past behavior which had been viewed as a threat by others, including bankruptcy court staff and other officials. DUSM Hartman explained to the defendant on multiple occasions that the defendant's continued threatening behavior would subject him to criminal prosecution.   The evidence of DUSM Hartman and the defendant's past interactions, their relationship, and the background for such interactions, aids in understanding how DUSM Hartman received the defendant's statement as a true threat which the defendant was capable of carrying out.

3) Direct Communication of the Threat

An additional important factor is whether a statement was communicated directly to the intended victim or to third parties. *Compare, e.g.*, *Watts*, 394 U.S. at 796 (purported threat to President made during "public rally on the Washington Monument grounds") *and FDRLST Media, LLC v. Nat'l Lab. Rels. Bd.*, 35 F.4th 108, 126 (3d Cir. 2022) (in unfair labor practice matter, overturning National Labor

Relations Board threat finding where employer's sarcastic public Twitter post—"first one of you tries to unionize I swear I'll send you back to the salt mine"—was directed at his 80,000 Twitter followers rather than his six employees), *with Kosma*, 951 F.2d at 554 ("Because [the defendant] sent his letters directly to the President, the only audience for them was the Secret Service and the staff of the White House mailroom, and it is doubtful that they were laughing.") *and Jackson*, 364 F. App'x at 780 (upholding conviction on harassment statute where the harassing calls were made directly to their intended victim).

Here, as explained above, the threat was made directly to a Federal Law enforcement official, one of the targets of the threat, immediately after a United States Bankruptcy Judge had dismissed a case involving the defendant.   The full background of DUSM Hartman's investigation, including the defendant's troubling past behavior with bankruptcy court personnel, is therefore intrinsic in understanding that the Defendant's words were directly communicated with the intent to interfere or impede with the official duties of the targets of the treat.

14

4) <u>Conditionality</u>

Conditional threats are less likely to constitute true threats. *See United States v. Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir. 2011); *see also Watts*, 394 U.S. at 707 (in directing judgment of acquittal, highlighting that the defendant's statement was "expressly made conditional upon an event—induction into the Armed Forces—which petitioner vowed would never occur"). Still, even conditional statements can be threats. *See. Kosma*, 951 F.2d at 554 ("Even if [the defendant's] threats were truly conditional, they could still be considered true threats."); *see also United States v. C.S.*, 968 F.3d 237, 245 (3d Cir. 2020) ("There is no rule that conditional statements, statements conveying a vague timeline or condition, or even wishes can never be a true threat. Rather, the focus is on whether the statements reflect, to a reasonable person, a serious expression of an intent to inflict bodily injury on an individual.") (internal quotation marks, citations, and alteration omitted); *United States v. Credico*, 718 F. App'x 116, 122 (3d Cir. 2017) (holding that a threat need not "specify the time and place wherein it will take place" and that even conditional statements can be threats).

15

The threat made by the defendant was not conditional. It was a direct statement of intention to "shoot up" the courthouse where the defendant knew United States judges and law enforcement personnel performed their official duties.  This threat was a culmination a years' long process of escalating aberrant behavior by the defendant toward bankruptcy court staff and federal law enforcement officials at the Sylvia H. Rambo United States Courthouse.

5) Context

The final critical "true threat" factor is the context in which the statement is made. *See United States v. Zavrel*, 384 F.3d 130, 136 (3d Cir. 2004)("[T]he focus of the inquiry here should be whether a reasonable person, familiar with the context in which a threat is communicated, would perceive the communication as a threat of harm."); *see also United States v. Fullmer*, 584 F.3d 132, 156 (3d Cir.2009) (holding that speech using "past incidents to instill fear in future targets" constituted true threats when "viewed in context"); *D'Amario*, 330 F. App'x at 413 ("When evaluating whether statements constitute a 'true threat,' the statements must be viewed in context . . . .") (internal quotation marks and citation omitted); *Voneida*,

16

337 F. App'x at 248 ("While some of the statements, taken in isolation, may not rise to the level of a threat within the meaning of § 875(c), that was not the context of the case here.").

This factor weighs most heavily toward the inclusion of the background actions of the defendant, especially those actions relating to the defendants' possession of and access to firearms, including ghost guns.

Given DUSM Hartman's knowledge on January 7, 2026, that the defendant had access to multiple firearms, and that DUSM Hartman only knew the current location of *two* of at least *four* guns suspected to be in the defendant's possession (the two confiscated in December 2023 by the York County Regional Police Department), the context of the defendant's earlier actions directly proves how DUSM Hartman would react to the defendant's threats, and, more importantly, prove that the defendant knew that DUSM Hartman would interpret his threat as a true threat, capable of being performed.

The defendants' statements on December 3, 2025, to CSO Reiff, regarding the CSO's fears that the defendant would "go on a rampage with his ghost gun," further provides context about the defendant's

17

intent to threaten DUSM Hartman and the defendant's knowledge that DUSM Hartman would view the threat as a serious expression of intended future violence.

## B. Alternatively, the Evidence, if Deemed Extrinsic, is Still Admissible Pursuant to 404(b) as Relevant Evidence Being Introduced for Proper, Non-Propensity Purposes

If the Court finds that the evidence described in the Government's Motion in Limine is extrinsic to the charged offense, the evidence is nonetheless admissible under 404(b) as it relevant evidence offered for a proper, non-propensity purpose, namely to establish the defendant's motive and intent to threaten to murder United States judges and law enforcement personnel, among other non-propensity purposes.

In *Huddleston v. United States*, 485 U.S. 681 (1988), the Supreme Court set out a four-part test for admission of Rule 404(b) evidence: (1) the evidence must have a proper purpose; (2) it must be relevant; (3) its probative value must outweigh its potential for unfair prejudice; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it is admitted." *United States v. Given*, 320 F.3d 452, 460 (3d Cir. 2033).

18

The Third Circuit has stated on numerous occasions that it "favors" the admission of evidence under Rule 404(b) if relevant for any purpose other than to prove propensity to commit the crime charged. *See, e.g. United States v. Johnson,* 199 F.3d 123, 128 (3d Cir. 1999); *United States v. Long,* 574 F.2d 761, 766 (3d Cir. 1978). Along the same lines, for decades the Court has consistently stated that Rule 404(b) is a rule of "inclusion" *See e.g. Long,* 574 F.2d at 765, *United States v. Scarfo,* 850 F.2d 1015, 1019 (3d Cir. 1988); *United States v. Sampson,* 980 F.2d 883, 886 (3d Cir. 1992)("404(b) is inclusive, not exclusive, and emphasizes admissibility."); *compare United States v. Repak,* 852 F.3d 230, 241 (3d Cir. 2017)("In sum, Rule 404(b) is a rule of exclusion, meaning that it excludes evidence unless the proponent can demonstrate its admissibility, but it is also "inclusive' in that it does not limit the non-propensity purposes for which evidence can be admitted."

As applicable in the present matter, proof of motive is a well-recognized non-propensity purpose for prior wrongs or bad acts. *See United States v. Lee,* 612 F.3d 170, 187 (3d Cir. 2010)(defendant's violent feud provided motive for possessing firearm); *United States v.*

*Sriyuth*, 98 F.3d 739, 747 (3d Cir. 1996)("Motive is evidence of the commission of any crime.")

Likewise, "allowing the jury to understand the circumstances surrounding the charged crime – completing the story- is a proper, non-propensity purpose under 404(b)." *Green,* 617 F.3d at 247. *See also United States v. O'Leary*, 739 F.2d 135, 136 (3d Cir. 1984)(need to show background of the charges and the parties familiarity with one another were proper purposes under 404(b)); *United States v. Simmons*, 679 F.2d 1042, 1050 (3d Cir. 1982)("necessary background information" was a proper purpose under 404(b)).

In addition, the court is required by Rule 403 to assure that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.  However, the rule makes clear that exclusion is allowed only if the prejudicial impact "substantially outweighs" the probative value. "[T]he Rule does not establish a mere imbalance as the standard but rather requires that the evidence "may" be barred only if its probative value is 'substantially outweighed' by its prejudice." *Long*, 574 F.2d at 765.  In part, this means that the test is almost surely not met where the probative value of the evidence itself is

high, as it is here.  The remedy of exclusion is also "extraordinary" and should be applied sparingly; the balance should be struck in favor of admissibility.  *United States v. Terzado-Madruga*, 897 F.2d 1099, 1117 (11th Cir. 1990).

"Prejudice" does not mean simply that the evidence is harmful to the defendant's case. *See, e.g. GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 88 (3d Cir. 2019)("Prejudice does not simply mean damage to the opponent's cause.  If it did, most relevant evidence would be deemed 'prejudicial'")(internal citations omitted). "The prejudice which [Rule 403] guards is *unfair* prejudice- prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts, which inhibits neutral application of the principles of law to the facts as found." *United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009)(*quoting Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002)(emphasis in original).

Any possible prejudice to the defendant can also be ameliorated through a jury instruction.  The Third Circuit has concluded that an appropriate jury instruction eliminates the chance of unfair prejudice

and that juries are presumed to follow such instructions. *See, e.g. Lee,* 612 F.3d at 191.

The background evidence to be introduced by the Government, as explained above, is highly probative to this case and is unlikely to meaningfully prejudice the defendant in any way.   The background evidence does not allege any criminal arrests or convictions. In fact, but for the defendant's physical restraint by York County Regional Police Department officers and the confiscation of his firearms in December of 2023, the background evidence would likely not be construed as involving criminal acts or wrongs by the jury, lessening any potential prejudicial effect.

As described in more detail in the Government's Motion i*n Limine,* the defendant's past conduct includes making vaguely threatening emails to attorneys and Trustees associated with his bankruptcy matters, a brief physical altercation with U.S. Trustee Carr, best described as an aggressive "chest bump,", comments to Court Security Officers about being monitored and owning both a ghost gun and a 3D printer, requests from Court personnel to have security officers available when the defendant was in court, and numerous examples of

innocuous yet troubling behavior which indicated the defendant knew he was considered a security threat by the USMS throughout 2024 and 2025.

The defendant's prior actions were *concerning*. They were concerning enough to warrant a USMS threat assessment and investigation, but ultimately not concerning enough so that DUSM Hartman closed the initial investigation in the summer of 2025. While the investigation was soon re-opened, that was only after additional escalating, yet non-criminal behavior was displayed the defendant in the fall of 2025. Such non-violent, yet aggressive and concerning behavior provides probative context to the defendant's January 7, 2026, threat, and it is not unduly prejudicial.

The evidence described in the Government's Motion *in Limine,* which the Government argues is intrinsic to the charged offense, would therefore also be admissible as relevant, extrinsic evidence as it is being offered solely for proper, non-propensity purposes, namely to establish the defendant's motive, intent, background to the parties, and to establish that the threat was a true "threat." The prejudicial effect of the evidence is also slight and would not substantially outweigh the

23

highly probative nature of the evidence. Such evidence therefore meets the four-part *Huddleston* test for admission as proper 404(b) evidence.

## III.    CONCLUSION

The Government should be permitted to present evidence described in greater detail in the Government's motion in limine, as intrinsic evidence to the charged crime in the instant Indictment, or alternatively, as relevant, extrinsic evidence, admissible pursuant to Rule 404(b).

Respectfully submitted,

BRIAN D. MILLER
United States Attorney

Dated:  March 19, 2026

/s/ James M. Buchanan
James M. Buchanan
Assistant U.S. Attorney
james.buchanan@usdoj.gov
NY ID#5385877
235 N. Washington Ave, Ste. 311
Scranton, PA 18503
(570) 348-2812 (office)

24

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :         NO. 1:26-CR-22
                                            :
        v.                                  :         (Judge Munley)
                                            :
ANDREW MULKERIN,                            :
        Defendant.                          :

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the instant brief is in compliance with Local Rule 7.8(b)(2), in that the Government's Brief in Support of its *Motion In Limine* and Notice of Intent to Introduce Relevant Evidence or, Alternatively to Introduce Evidence Pursuant to Federal Rule of Evidence 404(B) contains 4,628 words.

/s/ James M. Buchanan
JAMES M. BUCHANAN
Assistant U.S. Attorney

25

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA   :       NO. 1:26-CR-22
                          :
        v.                :       (Judge Munley)
                          :
ANDREW MULKERIN,          :
        Defendant.        :

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers. That on March 19, 2026, she served a copy of the attached

**GOVERNMENT'S BRIEF IN SUPPORT OF ITS *MOTION IN LIMINE* AND NOTICE OF INTENT TO INTRODUCE RELEVANT EVIDENC OR, ALTERNATIVELY TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 404(B)**

by ECF notice upon:

Heidi R. Freese, Esq.
Counsel for the defendant

/s/ Stephanie Kakareka
STEPHANIE KAKAREKA
Legal Administrative Specialist